MHW



## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

FILED
12-20-2010
DEC 20 2010  NF
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| John C. Justice,<br>      Plaintiff | )<br>) |
| | ) |
| v. | )          10 C 05331 |
| | ) |
| THE TOWN OF CICERO, ILLINOIS,<br>and<br>LARRY DOMINICK, Town President,<br>      Defendants | )    Judge Matthew Kennelly<br>)  Magistrate Judge Jeffrey T. Gilbert<br>)<br>) |

### NOTICE OF FILING

TO:   K. Austin Zimmer
      Holly L. Tomchey (ARDC #6270740)
      DEL GALDO LAW GROUP, LLC
      1441 S. Harlem Avenue
      Berwyn, Illinois 60402

Notice is hereby given that I have filed with the Clerk of the Court the attached Plaintiff's Reply to Motion to Dismiss.

_John C. Justice_

### CERTIFICATE OF SERVICE

I, John C. Justice, a non-attorney, have filed a copy of Plaintiff's Reply to Defendants' Motion to Dismiss with the Clerk of the Court and certify that I will deliver a copy to the Counsel for the Defendants at their office in Berwyn.

_John C. Justice, in propria persona_
1699 S. 55th Avenue
Cicero, IL 60804
708-656-3250
FAX - 6049

**FILED**

12-20-2010

DEC 2 0 2010 **NF**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| John C. Justice, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 10 C 05331 |
| | ) | |
| THE TOWN OF CICERO, ILLINOIS, | ) | Judge Matthew Kennelly |
| and | ) | Magistrate Judge Jeffrey T. Gilbert |
| LARRY DOMINICK, Town President, | ) | |
| Defendants | ) | |

## PLAINTIFF'S REPLY TO MOTION TO DISMISS

Comes Now the Plaintiff, John Justice, and offers the following for reply to the Defendants' Motion to Dismiss.

### I. Background.

I operate a business in Cicero that is not open to the public. Any customers I have communicate with me by phone and order my products, and no customers or members of the public visit my manufacturing facility which I own. I have a constitutional right to engage in this business. See *Scully v. Hallihan*, 365 Ill. 185, 191, 6 N.E.2d 176, 179 (1936) ("It is one of the fundamentals of our democratic form of government that every citizen has the inalienable right to follow any legitimate trade, occupation or business which he sees fit. His labor is his property, entitled to the full and equal protection of the law under the due process clause of the Federal

1

constitution. It is also embraced within the constitutional provision guaranteeing to everyone liberty and the pursuit of happiness. (*Allgeyer v. Louisiana*, 165 U.S. 578, 41 L. ed. 832.) "Plainly, a regulation which has the effect of denying or unreasonably curtailing the common right to engage in a lawful private business, such as that under review, cannot be upheld consistent with the Fourteenth Amendment. Under that amendment, nothing is more clearly settled than that it is beyond the power of a state, 'under the guise of protecting the public, arbitrarily (to) interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.' ."); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 278, 52 S. Ct. 371 (1932) ("[N]othing is more clearly settled than that it is beyond the power of a state, 'under the guise of protecting the public, arbitrarily [to] interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.'"); *Morehead v. N.Y. ex rel Tipaldo*, 298 U.S. 587, 601, 56 S.Ct. 918 (1936) ("Nothing is better settled in our constitutional law than that liberty does not mean merely freedom from physical restraint, but includes the right to work for a living by using the powers of brain and muscle in the ordinary activities of mankind."); *Greene v. McElroy*, 360 U.S. 474, 492, 79 S. Ct. 1400 (1959) ("[R]ight to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the

2

'liberty' and 'property' concepts of the Fifth Amendment."); *Goetz v. Windsor Central School District*, 698 F.2d 606, 609 (2nd Cir. 1983) ("Liberty as guaranteed by the Fourteenth Amendment denotes the right of the individual to engage in the common occupations of life and to enjoy privileges recognized as essential to the orderly pursuit of happiness."); *Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir. 1983) ("'It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [fourteenth] Amendment to secure.' * * * This Circuit has also repeatedly acknowledged the principle that a person has a liberty interest in pursuing an occupation."); and *Stidham v. Tex. Comm'n on Private Sec.*, 418 F.3d 486, 491 (5th Cir. 2005)("The Supreme Court has said that 'the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure[,]' and this court has 'confirmed the principle that one has a constitutionally protected liberty interest in pursuing a chosen occupation.'").

Also at issue in this case are ordinances of the defendant Town of Cicero requiring the registration of firearms. Cicero is a town organized pursuant to the laws of the State of Illinois; being created by the State, the Town can have no powers

3

greater than the State. The greatest power of the State of Illinois and its legislature is its police power, which is the power "to legislate in behalf of the public health, morals or safety by general regulations". See *People v. Rosehill Cemetary*, 334 Ill. 555, 560, 166 N.E. 112 (1929). But, that "power has constitutional limits, and any measure enacted or adopted in its exercise, to be sustained, must bear some reasonable relation to the purposes for which the power may be exercised. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private rights." *Id.*, 334 Ill. at 562. See also *Haller Sign Works v. Physical Culture Training School*, 249 Ill. 436, 94 N.E. 920, 922 (1911); *Town of Cortland v. Larson*, 273 Ill. 602, 113 N.E. 51 (1916) (ordinance prohibiting the private possession of liquor held invalid); *People v. Chicago, M. & St. P. Ry. Co.*, 306 Ill. 486, 138 N.E. 155 (1923) ("No exercise of the police power can disregard the constitutional guaranties in respect to the taking of private property, due process and equal protection' of the laws."); *Figura v. Cummins*, 4 Ill.2d 44, 122 N.E.2d 162 (1954) (law preventing work at home was void); and *People v. Hamm*, 149 Ill.2d 201, 216, 595 N.E.2d 540 (1992).

Via the Illinois Constitution, Art. I, Sec. 22, the right to possess firearms is protected: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." This constitutional provision empowers the

4

Illinois legislature to enact gun laws only pursuant to the police power and no other.

Pursuant to this police power, certain laws regarding firearms noted below have

indeed been enacted, which provide as follows:

(A) 720 ILCS 5/24-1(a), "A person commits the offense of unlawful use of weapons when he knowingly:

"(4) Carries or possesses in any vehicle or concealed on or about his person **except when on his land or in his own abode or fixed place of business** any pistol, revolver, stun gun or taser or other firearm, * * *

"(10) Carries or possesses on or about his person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or **except when on his land or in his own abode or fixed place of business, * * *"**.

(B) 720 ILCS 5/24-1.6(a), "A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:

"(1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person **except when on his or her land or in his or her abode, legal dwelling, or fixed place of business,** or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; or

"(2) Carries or possesses on or about his or her person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or **except when on his or her own land or in his or her own abode, legal dwelling, or fixed place of business,** or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm;"

(C) 720 ILCS 5/24-1.8(a), "A person commits unlawful possession of a firearm by a street gang member when he or she knowingly:

"(1) possesses, carries, or conceals on or about his or her person a firearm and firearm ammunition while on any street, road, alley, gangway, sidewalk, or any

5

other lands, **except when inside his or her own abode or inside his or her fixed place of business**, and has not been issued a currently valid Firearm Owner's Identification Card and is a member of a street gang; or".

(D) 720 ILCS 5/24-10: "It is an affirmative defense to a *violation of a municipal ordinance* that prohibits, regulates, or restricts the private ownership of firearms if the individual who is charged with the violation used the firearm in an act of self-defense or defense of another as defined in Sections 7-1 and 7-2 of this Code **when on his or her land or in his or her abode or fixed place of business.**"

Pursuant to these laws, it is perfectly lawful for any person to carry or possess "any pistol, revolver, stun gun or taser or other firearm" **"when on his land or in his own abode or fixed place of business"**.

Clearly, the Illinois legislature has concluded that there are no reasons based on "public health, morals or safety" – the police power – to regulate or control in any way the possession of firearms on an individual's own land, in his home or in his business. Furthermore, pursuant to 720 ILCS 5/24-10, the legislature has excluded the applicability of a *municipal ordinance* in certain situations **"when on [an individual's own] land or in his [ ] abode or fixed place of business."** By excluding the application of Illinois gun laws to a person's own land, home or business, it seems perfectly clear that Illinois has conceded that it lacks power to regulate the bearing of arms in such places. If Illinois lacks such power, then so does the defendant Town of Cicero, including its ordinance requiring the registration of

firearms that are only possessed and carried when on your own land, in your own home, or in your own business.

## II. *Res Judicata* Is Not Applicable Here.

In response to my complaint in this case, the defendants have filed a motion to dismiss raising a defense of *res judicata*. They are correct that I have filed a previous lawsuit against the Defendant Town of Cicero. I agree that Ex. 1 attached to the Defendants' brief in support of their motion to dismiss are pleadings that I filed in that prior lawsuit, as well as the district court's opinion in that prior lawsuit, the opinion of the Seventh Circuit in that prior appeal, and the Supreme Court's denial of certiorari. This court need not even download such pleadings from Pacer. But, the mere fact that the prior lawsuit was filed and litigated and I failed to obtain the relief I sought does not mean, as asserted by the Defendants here, that the instant lawsuit must be dismissed on *res judicata* grounds. There has been a material change in the law, and that change permits me to maintain this suit and makes the defendants' *res judicata* plea irrelevant.

The whole scope of Second Amendment litigation was recently changed by the decisions in *District of Columbia v. Heller*, 554 U.S. ___, 128 S.Ct. 2783 (2008), and *McDonald v. Chicago*, 561 U.S. ___, 130 S.Ct. 3020 (2010). This substantial change in this field of law mandates that the *res judicata* defense asserted here be rejected.

See *Commissioner v. Sunnen*, 333 U.S. 591, 600, 68 S.Ct. 715 (1948)("And where the situation is vitally altered between the time of the first judgment and the second, the prior determination is not conclusive. * * * [A] judicial declaration intervening between the two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable.").

This is a proposition with which this court is very familiar. In a case assigned to this very court, Cleary v. Philip Morris USA, Inc., Case No. 09 C 1596, this court held as follows:

> Even if the three elements of claim preclusion are met, a later case may not be precluded under Illinois law if an intervening change in law between the first and second cases creates a materially altered situation. See *Statler v. Catalano*, 293 Ill. App. 3d 483, 487, 691 N.E.2d 384, 387 (1997) ("*Res judicata* does not operate as an automatic bar where between the time of the first and the second there has been an intervening decision or a change in the law creating an altered situation."); see also, *C.O. Baptista Films v. Cummins*, 9 Ill. 2d 259, 265, 137 N.E.2d 393, 397 (1956) ("a definitive interpretation [of a statute] which was directly opposed to the [earlier] decision . . . [makes the earlier] erroneous construction of a statute . . . not binding upon the courts."); *State Farm Mut. Auto. Ins. Co. v. Duel*, 324 U.S. 154, 162 (1945) ("it is . . . the general rule that *res judicata* is no defense where between the time of the first judgment and the second there has been an intervening decision or a change in the law creating an altered situation.").

See also *People v. Gardner*, 331 Ill. App.3d 358, 367, 771 N.E.2d 26 (2002)("An issue rejected on direct appeal may be raised again, without being barred by *res judicata*, where the law on that issue has changed. *People v. Partee*, 268 Ill. App. 3d

857, 864, 645 N.E.2d 414 (1994) (defendant allowed to raise same *Batson* issue in his postconviction petition where law on the issue had changed since the court ruled on direct appeal)."); *Montana v. United States*, 440 U.S. 147, 158, 99 S.Ct. 970 (1979) ("[C]ollateral estoppel extends only to contexts in which the controlling facts and applicable legal rules remain unchanged."); *Global NAPs, Inc. v. Mass. Dep't of Telcoms. & Energy*, 427 F.3d 34, 45 (1st Cir. 2005) ("Preclusion ... may be defeated by showing . . . that there has been a substantial change in the legal climate suggesting a new understanding of the governing legal rules that may require a different application."); *Dalombo Fontes v. Gonzales*, 498 F.3d 1, 3 (1st Cir. 2007) ("an exception to *res judicata* traditionally exists 'where between the time of the first judgment and the second . . . there has been an intervening . . . change in the law creating an altered situation'."); *Faulkner v. National Geographic Enterprises, Inc.*, 409 F.3d 26, 37 (2nd Cir. 2005) ("Therefore, even where the specified elements of collateral estoppel are present, reexamination of a legal issue is appropriate where there has been a change in the legal landscape after the decision claimed to have preclusive effect. Restatement (Second) of Judgments § 28 (cmt. c). This is particularly so 'when the application of the rule of issue preclusion would impose on one of the parties a significant disadvantage, or confer on him a significant benefit, with respect to his competitors. . . . because the essential problem is that there has

9

been change in the law but not the facts.' Id. Accordingly, in some situations, 'a judicial declaration intervening between the two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable'."); *United States v. Graham*, 169 F.3d 787, 793 (3rd Cir. 1999); *Kania v. Fordham*, 702 F.2d 475, 476 n. 2 (4th Cir. 1983) ("Relitigation of an issue of public importance should not be precluded when there has been 'an intervening change in the applicable legal context.'"); *Jackson v. DeSoto Parish School Bd.*, 585 F.2d 726, 729 (5th Cir. 1978) ("*res judicata* is no defense where, between the first and second suits, there has been an intervening change in the law or modification of significant facts creating new legal conditions.");*Society of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1214 (5th Cir. 1991)("In this circuit, pure questions of law are subject to collateral estoppel, but only where there is no 'change in controlling legal principles between the two decisions.'"); *Coleman v. C.I.R.*, 16 F.3d 821, 830 (7th Cir. 1994)("There are three requirements for the invocation of collateral estoppel. First, there must be a final judgment in the first action. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Second, the issue implicated in the second suit must be identical in all respects to the issue decided in the first suit, with no change in the controlling facts and applicable legal rules. *Commissioner v. Sunnen*, 333 U.S. 591, 599-600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948). Third, the issue must

have been actually litigated and have been essential to the prior decision."); *Spradling v. City of Tulsa*, 198 F.3d 1219, 1223 (10th Cir. 2000) ("The doctrines of collateral estoppel and *res judicata*, however, apply only in cases where controlling facts and law remain unchanged. *Commissioner v. Sunnen*, 333 U.S. 591, 599-600 (1948). Consequently, *res judicata* and collateral estoppel are inapplicable where, between the first and second suits, an intervening change in the law or modification of significant facts create new legal conditions. *Id.* The Supreme Court decision in *Auer* constitutes an intervening change in the law sufficient to render collateral estoppel and *res judicata* inapplicable to the present case. See, e.g., *Community Hospital v. Sullivan*, 986 F.2d 357, 360 (10th Cir. 1993) (refusing to apply collateral estoppel following change in facts and law)."); and *Bingaman v. Dept. of Treasury*, 127 F.3d 1431, 1437 (Fed. Cir. 1997) ("In a number of cases, this court and others have held that a significant change in the 'legal atmosphere' — whether in the form of new legislation, a new court decision, or even a new administrative ruling — can justify a later court's refusal to give collateral estoppel effect to an earlier decision.").

Here, when I started my first lawsuit, the Supreme Court had not decided either the *Heller* case or the *McDonald* case. These cases certainly constitute an "intervening change in the law" of the Second Amendment and my claims against the Town of Cicero have been re-vitalized by these decisions. Consequently, the

defendants claim that *res judicata* bars prosecution of this present case are without merit.

## III. The Merits.

In *State v. Hamdan*, 264 Wis.2d 433, 478, 665 N.W.2d 785 (2003), that court held that "a citizen's desire to exercise the right to keep and bear arms for purposes of security is at its apex when undertaken to secure one's home or privately owned business." In this case, I would like to possess and carry firearms in the building I own where I conduct my business, which is not open to the public. It is my contention that the Second Amendment to the U.S. Constitution protects this constitutional right that I have, even against efforts by the Town of Cicero to mandate registration of such firearms. This is a fundamental, constitutional right, and any state law or municipal ordinance that abridges such right can be justified for only the most compelling reasons.

The Second Amendment[1] recognizes an explicitly-protected, fundamental right, restrictions on which are subject to strict scrutiny. A right is "fundamental" if it is "explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 33

---

[1] Most of that which follows in this brief has been 'lifted" from the appellant's brief in the appeal styled Heller v. District of Columbia, Case. No. 10-7036, U.S. Court of Appeals for the D.C. Circuit.

(1973). "[C]lassifications affecting fundamental rights . . . are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution").[2] "Under the strict-scrutiny test," the government has the burden to prove that a restriction "is (1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75 (2002).

Sir William Blackstone in his *Commentaries* "cited the arms provision of the [English] Bill of Rights as one of the fundamental rights of Englishmen." *Heller*, 128 S.Ct. at 2798. "By the time of the founding, the right to have arms had become fundamental for English subjects." *Id. McDonald*, *supra*, explicitly said so several times in holding that the Second Amendment right is incorporated through the Due Process Clause of the Fourteenth Amendment because "the right to keep and bear

---

[2] *See also Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied"); *Lawrence v. Texas*, 539 U.S. 558, 586 (2003) (Scalia, J., dissenting) (noting that "the standard of review that [is] appropriate" for "a fundamental right" is "strict scrutiny"); *Washington v. Glucksberg*, 521 U.S. 702, 766-67 (1997) (Souter, J., concurring in judgment) (citing *Poe v. Ullman*, 367 U.S. 497, 548 (1961) (Harlan, J., dissenting) for proposition that "an 'enactment involving . . . a most fundamental aspect of liberty . . . [is] subject to strict scrutiny'"); and *Foucha v. Louisiana*, 504 U.S. 71, 115 (1992) (Thomas, J., dissenting) ("Certain substantive rights we have recognized as 'fundamental'; legislation trenching upon these is subjected to 'strict scrutiny,' and generally will be invalidated unless the State demonstrates a compelling interest and narrow tailoring.").

arms is fundamental to *our* scheme of ordered liberty," and is "deeply rooted in this Nation's history and tradition . . . ." 2010 WL 2555188, *16.

Blackstone's view that the arms right was fundamental was "shared by the American colonists." *Id.* at *16-17. "The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights." *Id.* at *17. Its inclusion in the Bill of Rights "is surely powerful evidence that the right was regarded as fundamental in the sense relevant here." *Id.*

The efforts of the Reconstruction Congress, *McDonald* continued, "to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental." *Id.* at *19. "[T]he Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at *20.[3] Finding that there is "a 'popular consensus' that the right is fundamental," *id.* at *26, *McDonald* concluded that the Second Amendment is "a provision of the Bill of Rights that protects a right that is fundamental from an American perspective" and thus "applies equally to the Federal Government and the States." *Id.* at *28.

*McDonald* rejected the view "that the Second Amendment should be singled

---

[3] *See also id.* at 20 ("The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights.").

14

out for special – and specially unfavorable – treatment." *Id.* at *21. It refused "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *Id.* at *22.[4]

As *Heller* stated, "the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." 128 S.Ct. at 2797. This precludes use of the rational-basis standard of review:

> Obviously, the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms. See *United States v. Carolene Products Co.,* 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) ("There may be narrower scope for operation of the presumption of constitutionality [*i.e.,* narrower than that provided by rational-basis review] when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments . . ."). *Id.* at 2818 n.27.

*McDonald* rejected the power "to allow state and local governments to enact any gun control law that they deem to be reasonable . . . " 2010 WL 2555188, at *23. Further, *Heller* rejected Justice Breyer's "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an

---

[4] No constitutional right is "less 'fundamental' than" others, and "we know of no principled basis on which to create a hierarchy of constitutional values . . . ." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 484 (1982).

15

extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id.* at 2821. Such a test would allow "arguments for and against gun control" and the upholding of a handgun ban "because handgun violence is a problem . . . ." *Id.* Justice Breyer's dissent relied on cases such as *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), and *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), which are undeniably intermediate scrutiny cases. *See Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting). Even more revealingly, Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting). That is the case on which the United States principally relied in advocating that the Court adopt intermediate scrutiny. *See* Brief of United States at 8, 24, 28, *Heller*, 128 S. Ct. 2783. Thus, Justice Breyer's interest-balancing test is nothing other than intermediate scrutiny, and the Court's rejection of that approach in *Heller* forecloses this Court from adopting intermediate scrutiny in Second Amendment cases.

 *Heller* explained:

> Like the First, it [the Second Amendment] is the very *product* of an interest-balancing by the people . . . . And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home. *Id.*

Recognition of the right still allows "limited, narrowly tailored specific

exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms . . . ." *United States* v. *Emerson*, 270 F.3d 203, 261 (5 Cir. 2001) (upholding the prohibition of firearm by person subject to domestic violence restraining order), *cert. denied*, 536 U.S. 907 (2002).

*Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), which *Heller* affirmed, stated: "The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment." *Id.*, citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). However, such restrictions must not "impair the core conduct upon which the right was premised." *Parker*, 478 F.3d at 399. Similarly, restrictions on core First Amendment rights must pass strict scrutiny and, even where exercised in a public forum with public impact (where reasonable time, place, or manner restrictions may apply), the restrictions must be "narrowly tailored to serve a significant governmental interest . . . ." *Ward*, 491 U.S. at 791.

Here in this case involving the Town of Cicero, its ordinance requiring registration of firearms is challenged as being violative of the Second Amendment. This amendment protects a fundamental, constitutional right and any restrictions on that right are subject to strict scrutiny. I have the constitutional right to carry and

17

possess firearms at my business. See *State v. Hamdan, supra*. The Town's ordinance requiring registration of such firearms constitutes an unlawful, unconstitutional abridgement of my Second Amendment rights, especially where, as here, the Town has offered absolutely no compelling interest that justifies registration of firearms possessed in a business not open to the public.

## IV. Pleading Deficiencies.

The defendants complain that I have not pleaded sufficiently my Second Amendment claims in my complaint. If that be so, I request the opportunity to amend my complaint. To demonstrate that my complaint is sufficient, I attach the amended complaint filed in Heller II.

## CONCLUSION

For the reasons noted above, the Defendants' Motion to Dismiss must be denied.

Respectfully submitted this the 17th day of December, 2010.

John C. Justice, in propria persona
1699 South 55th Avenue
Cicero, Illinois 60804
708-656-3250

ATTACHMENT


AMENDED COMPLAINT OF HELLER II

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DICK ANTHONY HELLER,                          )
263 Kentucky Ave., S.E.                        )
Washington, D.C.,                              )
                                               )
ABSALOM F. JORDAN, JR.,                        )
1240 Savannah St., S.E.                         )
Washington, D.C.,                              )
                                               )
WILLIAM CARTER                                 )
2004 11th St., N.W., Apt. # 334                 )
Washington, D.C., and                          )
                                               )
MARK SNYDER                                    )
1356 Madison St, N.W.                           )
Washington, D.C.,                              )
                                               )
          Plaintiffs                           )
                                               )
     v.                                        )  CASE: 1:08-cv-01289
                                               )  Hon. Ricardo M. Urbina
THE DISTRICT OF COLUMBIA and                   )
                                               )
ADRIAN M. FENTY, Mayor,                        )
District of Columbia,                          )
                                               )
          Defendants                           )

**SECOND AMENDED COMPLAINT**

**(For Declaratory Judgment, Injunctive
Relief, and Writ of Mandamus)**

1. This is an action to vindicate the right of the people of the District of Columbia to keep

and bear arms under the Second Amendment to the United States Constitution, which prohibits

infringement of the right of law-abiding citizens to keep commonly-possessed firearms in the home

for lawful purposes.

1

## Parties

2. Plaintiff Dick Anthony Heller is a resident of the District of Columbia and a citizen of the United States.

3. Plaintiff Absalom F. Jordan, Jr. is a resident of the District of Columbia and a citizen of the United States.

4. Plaintiff William Carter is a resident of the District of Columbia and a citizen of the United States.

5. Plaintiff Mark Snyder is a resident of the District of Columbia and a citizen of the United States.

6. All plaintiffs are eligible under the laws of the United States and of the District of Columbia to receive and possess firearms.

7. Defendant District of Columbia ("the District") is the Seat of the Government of the United States and a municipality organized under the Constitution and laws of the United States.

8. Defendant Adrian M. Fenty is the Mayor of the District of Columbia whose principal place of business is in Washington, D.C. He is being sued in his official capacity.

## Jurisdiction

9. Jurisdiction is founded on 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(3) in that this action seeks to redress the deprivation, under of color of the laws, statute, ordinances, regulations, customs and usages of the District of Columbia, of rights, privileges or immunities secured by the United States Constitution.

10. This action seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983.

2

Venue lies in this district pursuant to 28 U.S.C. § 1391.

## Background

11. *District of Columbia v. Heller*, 128 S. Ct. 2783, 2821-22 (2008), held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." Thereafter, the District enacted several acts further restricting possession of firearms, in some cases more stringently than before the *Heller* decision.

12. On January 6, 2009, Mayor Fenty signed into law the Firearms Registration Emergency Amendment Act of 2008, which became effective immediately and which expires on April 6, 2009. On December 28, 2008, Mayor Fenty signed the Firearms Control Amendment Act of 2008, which was transmitted to Congress on February 10, 2009, and which will become effective on or about April 1, 2009, unless vetoed by Congress. Since both enactments amended the D.C. Code in identical ways, have identical section numbers, and have identical adverse effects on the plaintiffs, both enactments are referred to herein simply as "the Act."

## Unduly Burdensome Registration Requirements

13. The District requires that a person register to exercise Second Amendment rights: "no person or organization in the District shall possess or control any firearm, unless the person or organization holds a valid registration certificate for the firearm." D.C. Code § 7-2502.01(a). Possession of an unregistered firearm is punishable by one year's imprisonment and a $1,000 fine, and by five year's imprisonment and a $5,000 fine for a second offense. § 7-2507.06.

14. The Act added onerous new requirements to pre-*Heller* law making it far more burdensome to register a firearm of any kind. No registration certificate shall be issued unless the

3

Chief of Police determines, *inter alia*, that the applicant:

15. "Has not failed to demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the safe and responsible use, handling, and storage of the same in accordance with training, tests, and standards prescribed by the Chief . . . ." § 7-2502.03(a)(10). This may be required repeatedly regarding any "subsequent application" which is not "for the same type of firearms . . . ." *Id.* In particular, the applicant must take and pass a written test, and "[t]he type of test and its content shall be at the sole discretion of the Director [the commanding officer or acting commanding officer of the Identification and Records Division of the Metropolitan Police Department]." D.C. Municipal Regulations § 24-2311.3.

16. "Has vision better than or equal to that required to obtain a valid driver's license under the laws of the District of Columbia . . . ." D.C. Code § 7-2502.03(a)(11). This is applicable even to persons who wish merely to possess a firearm as an inheritance or a collector's item and not for actual use.

17. "Has completed a firearms training or safety course or class conducted by a state certified firearms instructor or a certified military firearms instructor that provides, at a minimum, a total of at least one hour of firing training at a firing range and a total of at least four hours of classroom instruction." D.C. Code § 7-2502.03(a)(13)(A). No public firing range exists in the District. This is applicable even to persons who wish merely to possess a firearm as an inheritance or a collector's item and not for actual use.

18. Has provided on a form, *inter alia*, any business or occupation in which the applicant has engaged the previous five years, the intended use of the firearm, where the firearm will generally be kept, and "Such other information as the Chief determines is necessary to carry out the provisions

4

of this unit." § 7-2502.03(b).

19. "The Chief shall require any registered pistol to be submitted for a ballistics identification procedure and shall establish a reasonable fee for such procedure." § 7-2502.03(d). No limit is set on the fee the Chief may impose. "'Pistol' means any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length." § 7-2501.01(12).

20. "The Chief shall register no more than one pistol per registrant during any 30-day period," with an exception for new residents. § 7-2502.03(e).

21. Section 7-2502.04 provides in part:

> (a) The Chief may require any person applying for a registration certificate to be fingerprinted . . . .
> (b) Each applicant . . . shall submit with the application 2 full-face photographs of himself . . . .
> (c) Every applicant . . . shall appear in person at a time and place prescribed by the Chief, and may be required to bring with him the firearm for which a registration certificate is sought . . . .

22. "Each application required by this subchapter shall be accompanied by a nonrefundable fee to be established by the Mayor . . . ." § 7-2502.05(b). No limit is set on the amount of the fee.

23. Further requirements to register a firearm are imposed by Chapter 23 of Title 24, District of Columbia Municipal Regulations. See §§ 24-2305 *et seq.* Reporting to the Firearms Registration Section (FRS) of the Metropolitan Police Department (MPD), the applicant must personally submit the application to register, acquire fingerprint cards, and provide photographs, a driver's license or letter from physician attesting to vision good enough to drive, and proof of residency. The person must pay fees for fingerprinting and registration, and submit to fingerprinting. The fingerprint cards must be submitted to the FRS, one for the office file and the other for an FBI criminal record check. The person must then await notification by mail from the FRS that requirements for registration have

been satisfied. No time limit is prescribed. The person must then return to the FRS to complete the process and obtain the MPD seal on the registration certificate.

24. Having a firearm registered does not prevent a person from being prosecuted for possession of an unregistered firearm, because the registration is valid only for three years. Section 207a of the Act provides:

> (a) Registration certificates shall expire 3 years after the date of issuance unless renewed in accordance with this section for subsequent 3-year periods.
> (b) A registrant shall be eligible for renewal of registration of a firearm if the registrant continues to meet all of the initial registration requirements set forth in section 203(a) and follows any procedures the Chief may establish by rule.

25. Moreover, § 207(g) of the Act provides in part: "The Chief shall establish, by rule, a method for conducting the renewal of registrations for all firearms registered prior to the effective date of the Firearms Registration Amendment Act of 2008 . . . ." On information and belief, the Chief will require all persons with registered firearms to re-register them beginning in or about April 2009.

26. To renew a registration, the applicant must submit a statement attesting to the registrant's possession of the registered firearm, address, and "continued compliance with all registration requirements set forth in section 203." Act § 207a(c). However, this simply duplicates information already in the original registration and in any notice of changed information filed pursuant to existing § 7-2502.08(1).

27. "An applicant for the renewal of a registration certificate may be charged a reasonable fee to cover the administrative costs incurred by the Metropolitan Police Department in connection with the renewal." Act § 207a(f). No limit is set on the fee that may be charged.

28. The Act does not presume that a registrant remains legally eligible to possess a firearm.

6

"A registrant shall submit to a background check once every 6 years to confirm that the registrant continues to qualify for registration under section 203." Act § 207a(d).

29. A registrant is required to notify the Chief in writing (A) immediately of the loss, theft, or destruction of a firearm, (B) of any change in registration information on the certificate or required by § 7-2502.03 (e.g., current business or occupation, intended use of the firearm, etc.), and (C) of the sale, transfer or other disposition of the firearm at least 48 hours before it occurs, including pertinent information on the transferee. § 7-2502.08(1).

30. Each registrant must: "Have in his possession, whenever in possession of a firearm, the registration certificate for such firearm, and exhibit the same upon the demand of a member of the Metropolitan Police Department, or other law enforcement officer." § 7-2502.08(3).

31. "In addition to any other criminal or civil sanctions that may be imposed, including section 706 [sic]," a registrant is subject to the following for any "violation or omission of the duties, obligations, or requirements imposed by section 208 [D.C. Code § 7-2502.08]": (1) for the first instance, a civil fine of $100; (2) for the second instance, a civil fine of $500, revocation of the registration, and prohibition of possessing or registering a firearm for five years; and (3) for the third instance, a civil fine of $500, revocation of the registration, and a permanent prohibition on possessing or registering any firearm. § 7-2502.09(b).

32. Thus, a registrant may be penalized and may lose his or her Second Amendment rights altogether for failure to notify the Chief of any change, e.g., in the registrant's current business or occupation, or in the intended use of the firearm, or for failure to exhibit a registration certificate upon the demand of a law enforcement officer, as required by § 7-2502.08.

33. In addition, if a registration expires and is inadvertently not renewed, such as due to

sickness or travel, possession of an unregistered firearm is punishable by one year's imprisonment and a $1,000 fine, and by five year's imprisonment and a $5,000 fine for a second offense. § 7-2507.06.

34. To exemplify the above onerous requirements, plaintiff Mark Snyder wished to purchase a Savage BTVS .22 Mag. rimfire caliber bolt action target rifle. On January 20, 2009, he was advised of the registration requirements by the Metropolitan Police Department (MPD). The next day he ordered and paid for the rifle from a federally licensed firearms dealer. On February 2, he received the registration paperwork from the police, filled it out and sent it to the dealer, who returned it on February 11. On February 17, he attempted to deliver his registration paperwork, photographs, and mental health form to the MPD, which informed him that he would first have to take the firearms course with four hours of classroom and one hour of range training. He then placed telephone calls to persons on the District's certified instructors roster and left messages. On February 19, at the MPD, he took the required written test, submitted fingerprints, completed the mental health form, and paid the fees. On February 21, he paid $125 and took the D.C.-approved course consisting of four hours of class and one hour of range time. Even though he was only attempting to register a bolt action rifle, the D.C.-approved course consisted of handgun training. On February 25, he called the MPD to learn that his registration was approved and proceeded to the MPD to pick up the registration papers. He subsequently returned to the federally licensed firearm dealer, which conducted a records check on him for criminal convictions, mental disability, or other prohibited category under the National Instant Background Check System (NICS), and then transferred the rifle to him.

35. Plaintiffs have been subjected to the above registration requirements in the past and will

continue to be subjected to them in the future, causing them to incur expenses, to suffer burdens, and to cost them time merely in order to exercise the constitutional right to keep and bear arms.

### Prohibition of Commonly-Possessed Pistols Not on the California Roster

36. "[A] pistol that is not on the California Roster of Handguns Certified for Sale, (also known as the California Roster of Handguns Determined Not to be Unsafe), pursuant to California Penal Code § 12131, as of January 1, 2009, may not be manufactured, sold, given, loaned, exposed for sale, transferred, or imported into the District of Columbia." Act § 504(a).

37. "[A] pistol that is not on the California Roster of Handguns Certified for Sale as of January 1, 2009, may not be owned or possessed within the District of Columbia unless that pistol was lawfully owned and registered prior to January 1, 2009." Act § 504(b).

38. "A registration certificate shall not be issued for a: . . . (5) An unsafe firearm prohibited under section 504 . . . ." D.C. Code § 7-2502.02(a)(5). However, § 504 does not refer to any "unsafe firearm," and instead refers to pistols that are "determined not to be unsafe" pursuant to California Penal Code § 12131.

39. No State in the United States, including California, criminalizes ownership or possession of any pistol that is not on the California Roster of Handguns Certified for Sale. Pistols that are not on the California Roster are commonly owned and possessed throughout the United States, including in California. The District stands alone in criminalizing the ownership and possession of any pistol that is not on the California Roster.

40. No State in the United States criminalizes the sale, giving, transfer, or import of a pistol on the California Roster, except that California makes it a misdemeanor punishable by imprisonment for not more than one year. Ca. Penal Code § 12125(a).

9

41.  To have a pistol listed on the said California Roster, its manufacturer must undertake costly application and testing procedures and must pay costly renewal fees annually.  Ca. Penal Code § 12125 *et seq.*; Ca. Dep't of Justice Regs. for Laboratory Certification & Handgun Testing Programs.  The requirement of annual renewal fees for firearms that have already been tested and approved demonstrates that the California Roster is a retail tax and licensing regimen and not a list of "safe" handguns.

42.  Manufacturers may avoid these efforts and costs by not submitting their pistols for listing on the California Roster and not marketing them in that State.  Manufacturers do not submit discontinued models of pistols for listing in the California Roster; such models may have been manufactured in large quantities for decades and many are possessed by the public.

43.  On or about February 17, 2009, plaintiff Jordan submitted to the Metropolitan Police Department an Application for Firearms Registration Certificate for a Smith & Wesson Model 59, 9mm caliber pistol, to be used for "personal protection, sport and recreation."  By letter dated February 18, 2009, the Metropolitan Police notified Jordan that the pistol is unregisterable because: "The listed weapon is not on the California Roster of Handguns Certified for Sale as required by D.C. Code 7-2505.04."

44.  The California Roster, which was first created in 2001, includes only currently-produced pistols submitted by manufacturers.  Production of the Model 59 pistol was discontinued in or about 1980 and was thus never submitted for inclusion on the California Roster.  The Model 59 pistol has the same safety features and design characteristics as later Smith & Wesson models that are on the California Roster.

45.  Many used firearms are less expensive than new ones and are thus more affordable by

10

low-income persons. Many models of used pistols are not on the California Roster because such models were no longer manufactured at the beginning of the California Roster in 2001 or when new requirements became effective in 2006 and 2007. The Act thus prohibits less expensive used pistols just because they are not on the California Roster, which may be the only pistols affordable by poor persons.

46. The Act exempts from the above requirements "Pistols that are designed expressly for use in Olympic target shooting events" (which are very expensive) and "Certain single action revolvers," both "as defined by rule." § 504(e)(3) & (4). The Act does not exempt pistols used in other sporting events, in hunting, or for self defense. The Act does not exempt single-shot pistols, although such pistols are exempted in California Penal Code § 12133 and for that reason do not appear on the California Roster.

47. The Chief is authorized "to prescribe by rule the firearms permissible pursuant to subsection (e) of this section." § 504(f). No criteria for such rule are specified.

### Prohibition of Commonly-Possessed Firearms Denigrated as "Assault Weapons"

48. The Act prohibits possession of a wide array of commonly-possessed rifles, shotguns, and pistols which it pejoratively and incorrectly calls "assault weapons." "A registration certificate shall not be issued for a: . . . (6) An assault weapon . . . ." D.C. Code § 7-2502.02(a)(6). "Assault weapon" is defined to include numerous semiautomatic firearms with specified model names and others with certain generic features. § 7-2501.01(3A)(A)(I). They include:

49. *"(I) All of the following specified rifles:"*, following which are a long list of named rifles, such as "Colt AR-15 series" and "Armalite AR-180." *"(VIII) All other models within a series that are variations, with minor differences, of those models listed in subparagraph (A) of this paragraph,*

11

*regardless of the manufacturer . . . ."* The Act does not define "series," "variations," or "minor differences."

50. The above-referenced "AR-15 series" and its "variations" include rifles that are widely used in the Civilian Marksmanship Program (CMP), which is controlled by the federally-chartered Corporation for the Promotion of Rifle Practice and Firearms Safety. P.L. 105-225, 112 Stat. 1253, 1335 (1998). The CMP functions "(1) to instruct citizens of the United States in marksmanship; [and] (2) to promote practice and safety in the use of firearms . . . ." 112 Stat. at 1337.

51. On or about March 19, 2009, plaintiff Heller submitted to the Metropolitan Police Department an Application for Firearms Registration Certificate for a Bushmaster XM-15-E2S, .223 caliber, rifle, "For use in the Civilian Marksmanship Program, kept in my home." By letter dated March 19, 2009, the Metropolitan Police notified Heller that the rifle is unregisterable because: "The listed weapon is defined as an 'assault weapon' and prohibited from being registered in the District of Columbia per the Firearms Registration Act of 2009, amendment 12-22-08, D.C. Code 7-2501.01."

52. On or about February 17, 2009, plaintiff Jordan submitted to the Metropolitan Police Department an Application for Firearms Registration Certificate for an Armalite AR-180 .223 caliber semiautomatic rifle, to be used for "personal protection." By letter dated February 18, 2009, the Metropolitan Police notified Jordan that the rifle is unregisterable because: "The listed weapon is defined as an 'assault weapon' and prohibited from being registered in the District of Columbia per the Firearms Registration Act of 2009, amendment 12-22-08, D.C. Code 7-2501.01."

53. "Assault weapon"is further defined as: *"(II) All of the following specified pistols:"*, following which are a list of named pistols beginning with "UZI." UZI is the first name of the famed

12

Jewish firearm designer Uzi Gal, and is not the name of any specific model with any specific features. The District thus purports to prohibit a firearm based solely on the name of the designer without regard to any characteristics of the firearm.

54. On or about March 19, 2009, plaintiff Heller submitted to the Metropolitan Police Department an Application for Firearms Registration Certificate for a Baby Eagle UZI, 9mm semiautomatic pistol, for "self-defense in the home." This is an ordinary pistol similar to other 9mm pistols. By letter dated March 19, 2009, the Metropolitan Police notified Heller that the pistol is unregisterable because: "The listed weapon is defined as an 'assault weapon' and prohibited from being registered in the District of Columbia per the Firearms Registration Act of 2009, amendment 12-22-08, D.C. Code 7-2501.01."

55. "Assault weapon"is further defined as: *"(III) All of the following specified shotguns:"*, following which are a list of named shotguns.

56. "Assault weapon"is further defined as: *"(IV) A semiautomatic, [sic] rifle that has the capacity to accept a detachable magazine and any one of the following:"*, following which are generic listings such as "(aa) A pistol grip that protrudes conspicuously beneath the action of the weapon; (bb) A thumbhole stock; (cc) A folding or telescoping stock . . . ." Such rifles are commonly possessed for lawful purposes throughout the United States.

57. Before passage of the Act, plaintiff Carter ordered and paid for an LMT Defender 2000 .223 caliber semiautomatic rifle for $1,806.94. Upon the rifle being shipped to and received by a licensed firearms dealer, on or about February 24, 2009, Carter submitted to the Metropolitan Police Department an Application for Firearms Registration Certificate for the rifle for "recreational activity, NRA range." By letter dated February 24, 2009, the Metropolitan Police notified Carter that

13

the rifle is unregisterable because: "The listed weapon is defined as an 'assault weapon' and prohibited from being registered in the District of Columbia per the Firearms Registration Act of 2009, amendment 12-22-08, D.C. Code 7-2501.01." Such determination was made on the basis that the rifle has a pistol grip that protrudes conspicuously beneath the action of the weapon and a telescoping stock.

58. "Assault weapon"is further defined as: *"(V) A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following: "*, following which are generic listings such as "A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer," and "The capacity to accept a detachable magazine at some location outside of the pistol grip . . . ." The former would include threading for target-style barrel weights or muzzle brakes to reduce recoil.

59. "Assault weapon"is further defined as: *"(VI) A semiautomatic shotgun that has both of the following: "*, including certain stock and grip features.

60. "Assault weapon"is further defined as: *"(VII) A semiautomatic shotgun that has the ability to accept a detachable magazine. "* Having a detachable magazine allows for safe unloading of a shotgun.

61. The term "assault weapon" is also defined to include: *"Any firearm that the Chief may designate as an assault weapon by rule, based on a determination that the firearm would reasonably pose the same or similar danger to the health, safety, and security of the residents of the District as those weapons enumerated in this paragraph. "* § 7-2501.01(3A)(A)(iii). This empowers the Chief to ban any firearm of any kind whatever without regard to any defined feature, or to ban all firearms simply by designating them with the label "assault weapon."

62. Excluded from the term "assault weapon" are a list of pistols "designed expressly

14

for use in Olympic target shooting events, sanctioned by the International Olympic Committee and by USA Shooting, the national governing body for international shooting competition in the United States," and "new models of competitive pistols" exempted by the Chief "based either on recommendations by USA Shooting consistent with the regulations contained in the USA Shooting Official Rules or on the recommendation or rules of any other organization that the Chief considers relevant." § 7-2501.01(3A)(B), (C). No exemption exists for pistols designed for other types of target shooting events, hunting, or self defense.

### Prohibition of Commonly-Possessed Magazines for Firearms

63. The Act enacted § 7-2506.01(b), which provides: "No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm." That term is defined as any magazine or other device that "has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." Violation is punishable by a $1,000 fine and one year in prison. § 7-2507.06.

64. Magazines that have a capacity of more than 10 rounds of ammunition are commonly possessed by law-abiding citizens throughout the United States for self defense, target shooting, hunting, and other lawful purposes. Such magazines would be useful for militia purposes. Many firearms are designed for and sold with magazines that hold more than 10 rounds.

65. The need for and usefulness of magazines holding more than 10 rounds for lawful defense of self and others is demonstrated by the fact that they are issued to the police. In 1989, the District Metropolitan Police Department adopted the Glock 17 as its service pistol, magazines for which hold 17 rounds, and later adopted the Glock 19, magazines for which hold 15 rounds.

66. On or about March 19, 2009, plaintiff Heller submitted to the Metropolitan Police

15

Department an Application for Firearms Registration Certificate for a Sig Sauer P226 9mm pistol.

On the form under "No. of Shots" is written the number "15," which means that the magazine has

a capacity of 15 rounds of ammunition. The intended use of the firearm is specified as "self-defense

in the home." By letter dated March 19, 2009, the Metropolitan Police disapproved the application

for the following reason: "Unregisterable firearm (15 round ammunition capacity is defined as a

'large capacity ammunition feeding device' and exceeds 10 rounds as required by D.C. Code 7-

2506.01(b))."

67. Administration and enforcement of the provisions at issue are by agents and employees

of the District of Columbia under the supervision of defendant Fenty. As a proximate cause of the

administration and enforcement of above provisions of the Act as aforesaid, plaintiffs have been and

will continue to be subjected to irreparable harm.

## COUNT ONE

### (Unduly Burdensome Registration Requirements)

68. Paragraphs 1 through 67 are realleged and incorporated herein by reference.

69. The District's onerous firearm registration, expiration, and re-registration requirements,

both singly and as a whole, infringe on the constitutional right of the people, including plaintiffs, to

keep and bear arms and unduly burden exercise of their Second Amendment rights.

70. Plaintiffs are subject to various prohibitions in the federal Gun Control Act, 18 U.S.C.

§ 921 *et seq.*, as well as the D.C. Code, both of which forbid dangerous categories of persons from

possession of firearms. To obtain firearms, plaintiffs are subject to record checks under the National

Instant Criminal Background Check System (NICS), which accesses records of criminal convictions

and indictments, mental disabilities, illegal alien status, and other prohibited categories. These

16

provisions of law are more than adequate to ensure that plaintiffs are eligible lawfully to exercise their constitutional right to keep and bear arms.

71. Plaintiffs Heller, Jordan, Carter, and Snyder have been and will continue to be subjected to the following unnecessary, arbitrary, and capricious requirements, in violation of said rights:

a.   The duty to register for the mere possession of a firearm, with severe criminal penalties for violation.  D.C. Code §§ 7-2502.01(a), 7-2507.06.

b.   The duty to demonstrate knowledge concerning the use, handling, and storage of firearms.  § 7-2502.03(a)(10).

c.   The requirement to have vision qualifying one for a driver's license.  § 7-2502.03(a)(11).

d.   The firearms training or safety course or class requiring one hour of firing training at a firing range and four hours of classroom instruction.  § 7-2502.03(a)(13)(A).

e.   The duty to report one's business or occupation, intended use of each firearm, where each firearm will be kept, and other information determined by the Chief.  § 7-2502.03(b).

f.  Submission of a pistol for a ballistics identification procedure and payment of any fee the Chief deems reasonable.  § 7-2502.03(d).

g.   The prohibition on registration of more than one pistol per 30 days.  § 7-2502.03(e).

h.  Fingerprints, photographs, and personal appearance of the applicant with the firearm sought to be registered.  § 7-2502.04.

i. The registration fee established by the Mayor. § 7-2502.05(b).

j. The expiration of registration certificates after three years and requirement of renewal, including the charging of a fee. § 207a(a), (b), (f) of the Act.

k. The duty to submit to a background check once every 6 years. Act § 207a(d).

l. The duty to exhibit the registration certificate upon the demand of a member of the Metropolitan Police Department, or other law enforcement officer, without regard to the basis for such demand. § 7-2502.08(3).

m. Subjecting registrants to fines, revocations of registration, and prohibitions on possession of firearms for violation or omission of § 7-2502.08. § 7-2502.09(b).

72. Accordingly, the above provisions, individually and collectively, and facially and as applied, unduly burden, impede, and infringe on the Second Amendment right of the people, including plaintiffs, to keep and bear arms and are void.

### COUNT TWO

### (Prohibition on Commonly-Possessed Firearms and Magazines)

73. Paragraphs 1 through 72 are realleged and incorporated herein by reference.

74. The District prohibits three classes of items which are commonly possessed by law-abiding persons throughout the United States for lawful purposes: pistols that are not on the California Roster of Handguns Certified for Sale; firearms the District pejoratively calls "assault weapons"; and magazines that have the capacity to accept more than 10 rounds of ammunition.

75. As set out above, the District denied an application by plaintiff Jordan to register a pistol

18

because it is not on the California Roster; denied applications by plaintiffs Heller, Jordan, and Carter to register rifles and a pistol because the District denigrates them as "assault weapons"; and denied an application by plaintiff Heller to register a pistol because it has a magazine which holds more than ten rounds of ammunition.

76. Accordingly, the following provisions facially and as applied infringe on the right of the people, including plaintiffs, to keep and bear arms as guaranteed by the Second Amendment to the United States Constitution: § 504 of the D.C. Firearms Registration Amendment Act of 2008, which prohibits pistols not on the California Roster, and D.C. Code § 7-2502.02(5), which prohibits registration of such pistols; D.C. Code § 7-2502.02(6), which prohibits registration of an "assault weapon"; and D.C. Code § 7-2506.01(b), which prohibits possession, sale, and transfer of an ammunition feeding device with a capacity of more than ten rounds.

## COUNT THREE

### (Provisions at Issue Are Not "Usual and Reasonable Police Regulations")

77. Paragraphs 1 through 76 are realleged and incorporated herein by reference.

78. D.C. Code § 1-303.43, enacted by Congress and entitled "Regulations relative to firearms, explosives, and weapons," provides:

> The Council of the District of Columbia is hereby authorized and empowered to make, and the Mayor of the District of Columbia is hereby authorized and empowered to enforce, all such usual and reasonable police regulations, in addition to those already made under §§ 1-303.01 to 1-303.03 as the Council may deem necessary for the regulation of firearms, projectiles, explosives, or weapons of any kind in the District of Columbia.

79. The provisions of the D.C. Code alleged to infringe on Second Amendment rights in Counts One, Two, and Three above are not "usual and reasonable police regulations . . . necessary

19

for the regulation of firearms," nor could the Council reasonably deem them such. No such provisions exist in the laws of the United States or of any of the States, with the exception of a very few number of States in regard to certain provisions only. Instead, such provisions are most unusual and are unreasonable.

80. Accordingly, such provisions are not authorized by § 1-303.43, are beyond the District's power to enact, and are void.

WHEREFORE, plaintiffs pray that the Court:

1. Enter a declaratory judgment that the following provisions (1) infringe on the right of the people to keep and bear arms, in violation of the Second Amendment to the United States Constitution, and (2) are not authorized by D.C. Code § 1-303.43 and are void: the unduly burdensome registration and re-registration requirements as alleged in Count One; the prohibitions on pistols that are not on the California Roster, on "assault weapons," and on magazines holding more than ten rounds as alleged in Count Two.

2. Issue preliminary and permanent injunctions enjoining defendants District of Columbia, Adrian M. Fenty, and their officers, agents, and employees from administration and enforcement of the provisions alleged herein to violate the Second Amendment and D.C. Code § 1-303.43.

3. In the alternative, issue preliminary and permanent injunctions and a writ of mandamus requiring defendants District of Columbia, Adrian M. Fenty, and their officers, agents, and employees to register pistols which are not on the California Roster, firearms which the District defines as "assault weapons," and firearms with magazines holding more than ten rounds.

4. Order defendants to refund and reimburse to plaintiffs all fees, costs, and expenses paid by plaintiffs arising out of the District's firearm registration requirements.

5. Grant such other and further relief as may be proper.

6. Award plaintiff attorney's fees and costs.

Date: March 25, 2009

Respectfully Submitted,

Dick Anthony Heller, Absalom F. Jordan, Jr.,
William Carter, Mark Snyder,
Plaintiffs

By Counsel

/s/ Stephen P. Halbrook
STEPHEN P. HALBROOK, D.C. Bar No. 379799


/s/ Richard E. Gardiner
RICHARD E. GARDINER, D.C. Bar No. 386915

3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276

Attorneys for Plaintiffs

21